# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 14, 2002 Session

## JOANNE CARTER v. FIRST SOURCE FURNITURE GROUP

**Appeal from the Chancery Court for Lauderdale County**
**No. 11750     Martha B. Brasfield, Chancellor**

---

**No. W2001-01849-SC-WCM-CV - Filed December 19, 2002**

---

In this workers' compensation case, we granted the defendant's motion for review pursuant to Tennessee Code Annotated section 50-6-225(e) primarily to determine whether the trial court erred by finding that the two and one-half times cap on the permanent partial disability award set forth in Tennessee Code Annotated section 50-6-241(a)(1) did not apply, where the plaintiff was fired by the employer for gross misconduct prior to being treated for her injury. We hold that an employer should be permitted to enforce workplace rules without being penalized in a workers' compensation case. Thus, the trial court erred in refusing to apply the two and one-half times cap found in Tennessee Code Annotated section 50-6-241(a)(1).  Furthermore, under our review, where expert medical testimony is by deposition, we may draw our own conclusions about the weight and credibility to be given to the medical testimony. Given the disagreement between the evaluating and treating physicians over the surgical procedure performed on the plaintiff, we are of the opinion that the physician who actually performed the surgery was better situated to understand and rate the resulting impairment.  We adopt the medical impairment rating of the treating physician, equating to 6% to the body as a whole and set the plaintiff's permanent partial disability at 15% to the body as a whole.

**Tenn. Code Ann. § 50-6-225(e); Findings of Fact and Conclusions of Law of the Special Workers' Compensation Appeals Panel Rejected;**
**Judgment of the Trial Court is Reversed**

FRANK F. DROWOTA, III, C. J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and WILLIAM M. BARKER, JJ. joined.  JANICE M. HOLDER, J. Not Participating.

S. Newton Anderson and Gayle B. Lakey, Memphis, Tennessee, for the appellant, First Source Furniture Group.

Gregory A. Petrinjak and Mark P. Barnett, Jackson, Tennessee, for the appellee, Joanne Carter.

## OPINION

## Factual Background

The plaintiff, Joanne Carter ("Carter"), worked for the defendant, First Source Furniture Group, which does business in Halls, Tennessee, as Anderson Hickey ("Anderson Hickey"). At the time of her injury, the plaintiff was employed on Anderson Hickey's assembly line, making filing cabinets.

At the time of trial, Carter was forty-five years old. She has a high school education, and her work experience has consisted of waitressing, nursing home work, and factory work. Her work at Anderson Hickey consisted of lifting pedestals and hammering drawers into place with a rubber mallet.

Plaintiff alleges that, as a result of this work, she sustained an injury to her right shoulder in January 2000. She saw an orthopedic surgeon, Dr. Riley Jones, on March 21, 2000. Dr. Jones treated Carter and ordered an MRI, which took place on March 27, 2000. On March 28, 2000, Carter returned to Dr. Jones; they discussed the results of the MRI, and Dr. Jones injected Carter with Celestone and Marcaine with instructions for her to return in a week.

Two days later, on March 30, 2000, Carter was involved in an altercation at work. Another employee called Carter a "bitch," and Carter responded by chasing the other employee with a box cutter and kicking him. As a result of this incident, and pursuant to Anderson Hickey's policy against violence in the workplace, Carter was terminated for gross misconduct.

Following her termination from Anderson Hickey, the plaintiff continued to see Dr. Jones. On April 24, 2000, Dr. Jones performed arthroscopic surgery on Carter's shoulder. Carter completed one month of physical therapy and returned to Dr. Jones on June 8, 2000, with full range of motion and some continuing residual pain. Dr. Jones released her for work at full duty at that time.

The plaintiff then found new employment at World Color Press, where she first stacked boxes and now drives a forklift. Carter was still employed by World Color Press at the time of trial, making $9.24 per hour, approximately one dollar per hour less than her job at Anderson Hickey. Carter has the potential to earn $11.49 per hour after another year with World Color Press, over one dollar more per hour than her wage at Anderson Hickey.

Carter visited Dr. Jones on July 25, 2000, again with full range of motion and some pain. Dr. Jones placed her at maximum medical improvement with no restrictions on her physical activity, and he assigned her a 10% impairment rating to the upper extremity, equating to a 6% impairment to the body as a whole. Dr. Jones instructed Carter to take ibuprofen or Tylenol for her pain and to return to him if she had any problems. Thereafter, Carter did not return to Dr. Jones.

Plaintiff filed her complaint for workers' compensation benefits on July 17, 2000, alleging that she suffered her injury as a result of her employment with Anderson Hickey. At trial, the trial court heard testimony from the plaintiff and Randy Good, the human resources manager at Anderson

Hickey at the time of Carter's termination. The trial court also received testimony in the form of depositions from Dr. Jones, the treating physician, and Dr. Joseph C. Boals, III, who performed an independent medical examination of Carter at the request of Carter's attorney.

Dr. Boals found that, after examining Carter and reviewing Dr. Jones' notes, Carter suffers from a 19% impairment to the upper extremity, or 11% impairment to the body as a whole. Dr. Boals found a higher impairment rating because he believed that the plaintiff qualified for two separate impairment ratings, based on the two procedures performed on her shoulder during surgery: the excision of the distal clavicle and the excision of the coracoacromial ligament. Dr. Jones assigned an impairment rating based only on the excision of the distal clavicle, explaining that the American Medical Association Guides to the Evaluation of Permanent Impairment ("the Guidelines") no longer provide an impairment rating for excision of the coracoacromial ligament, since newer arthroscopic technology improved the procedure, and it now results in no impairment. Dr. Boals, however, extrapolated from the opening section of the Guidelines, which gives leeway to find impairment if the Guidelines do not specifically address a procedure. Dr. Jones testified that the acromioplasty performed on the plaintiff is "one of the most common shoulder operations that's performed in the world at this point," and that if it warranted an impairment rating, the Guidelines would include it.

Upon hearing testimony and reading the depositions, the trial court gave more weight to Dr. Boals' impairment rating and set the plaintiff's medical impairment rating at 11% to the body. Then, determining that the two and one-half times cap on a permanent partial disability award, set forth in Tennessee Code Annotated section 50-6-241(a) (1999), did not apply, the trial court awarded the plaintiff permanent partial disability benefits based on 30% permanent partial disability to the person.

The defendant employer appealed to the Special Workers' Compensation Appeals Panel, asserting (1) that the trial court erred by holding that the two and one-half times cap of the Tennessee Code Annotated section 50-6-241(a) was inapplicable, and (2) that the evidence preponderates against an award of permanent partial disability benefits based on 30% to the body as a whole. The Panel affirmed the judgment of the trial court. The Panel found that rejection of the cap set forth in Tennessee Code Annotated section 50-6-241(a) was appropriate where the employer made no offer of re-employment, despite the fact that the employer had terminated the employee for reasons unrelated to her injury. Further, the Panel held that the evidence did not preponderate against the trial court's award based on 30% permanent partial disability.

We granted the defendant's motion for review and now reverse the trial court's judgment.

### Standard of Review

In workers' compensation cases, the standard of review is de novo upon the record, accompanied by a presumption of the correctness of the trial court's factual findings, unless the preponderance of the evidence is otherwise. Tenn. Code Ann. § 50-6-225(e)(2); Mannery v. Wal-

Mart Distrib. Center, 69 S.W.3d 193, 196 (Tenn. 2002). "The reviewing court must give considerable deference to the trial court's findings with regard to the weight and credibility of oral testimony, as it is the trial court which had the opportunity to observe the witness's demeanor and to hear the in-court testimony." Long v. Tri-Con Industries, Ltd., 996 S.W.2d 173, 178 (Tenn. 1999) (citing Hill v. Eagle Bend Mfg., Inc., 942 S.W.2d 483, 487 (Tenn.1997)). Under this standard, considerable deference must be granted where the trial judge has seen and heard the witnesses, but "where the issues involve expert medical testimony and all the medical proof is contained in the record by deposition . . . then this Court may draw its own conclusions about the weight and credibility of that testimony." Krick v. City of Lawrenceburg, 945 S.W.2d 709, 712 (Tenn.1997).

## Analysis

### Application of Tennessee Code Annotated section 50-6-241(a) and (b)

The Tennessee Workers' Compensation statute sets caps on an employee's permanent partial disability award, with the level of the cap dependent on whether or not the pre-injury employer returns the employee to work at a wage equal to or greater than the employee's pre-injury wage. Tennessee Code Annotated section 50-6-241(a)(1) and (b) provide as follows:

> For injuries arising on or after August 1, 1992, in cases where an injured employee is eligible to receive any permanent partial disability benefits, pursuant to § 50-6-207(3)(A)(i) and (F), and the pre-injury employer returns the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of injury, the maximum permanent partial disability award that the employee may receive is two and one-half (2 1/2) times the medical impairment rating determined pursuant to the provisions of the American Medical Association Guides to the Evaluation of Permanent Impairment (American Medical Association), the Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impairment (American Academy of Orthopedic Surgeons), or in cases not covered by either of these, an impairment rating by any appropriate method used and accepted by the medical community.

Tenn. Code Ann. § 50-6-241(a)(1) (1999).

> Subject to factors provided in subsection (a) of this section, in cases for injuries on or after August 1, 1992, where an injured employee is eligible to receive permanent partial disability benefits, pursuant to § 50-6-207(3)(A)(i) and (F), and the pre-injury employer does not return the employee to employment at a wage equal to or greater than the wage the employee was receiving at the time of injury, the maximum permanent partial disability award that the employee may receive is six (6) times the medical impairment rating determined pursuant to the provisions of the American Medical Association Guides to the Evaluation of Permanent

Impairment (American Medical Association), the Manual for Orthopedic Surgeons in Evaluating Permanent Physical Impairment (American Academy of Orthopedic Surgeons), or in cases not covered by either of these, an impairment rating by any appropriate method used and accepted by the medical community.

Tenn. Code Ann. § 50-6-241(b) (1999).

The trial court determined that the two and one-half times multiplier from section 50-6-241(a)(1) did not apply in Carter's case. The trial court did not, however, base its decision on the language of the statute. Instead, the trial court found that "had the plaintiff still been employed when she was released, she would not have been able to return to the job that she was holding when she was terminated in March, 2000. The Court further finds that there was no proof that a job would have been available to her which she could physically perform."

The Workers' Compensation Appeals Panel found that the test to determine which cap should apply is not "whether the injured worker is able to return to work," but "whether the employer made a reasonable offer of re-employment despite the disability resulting from a work-related injury." The Panel then cited the "meaningful return to work" test discussed in Nelson v. Wal-Mart Stores, Inc., 8 S.W.3d 625, 630 (Tenn. 1999) and Newton v. Scott Health Care Center, 914 S.W.2d 884 (Tenn. 1995). In cases where the employee is not working for the employer following the employee's recovery, this test looks to the reasonableness of the employer's offer of re-employment and the reasonableness of the employee's refusal of the offer. The Panel noted that the defendant did not offer to return the plaintiff to work at all, but the Panel declined to consider the employer's reason for the employee's termination, because to do so "would encourage trial courts to conduct a trial within a trial to determine the justness of the employer's decision not to offer re-employment."

This Court believes that the determinative issue in this case is whether the employer, having fired an employee for misconduct prior to treatment of the employee's injury, is required to make an offer of re-employment following treatment in order to take advantage of the two and one-half times cap set forth in section 50-6-241(a)(1).

This case is unique because it presents a factual time line different from other cases that have interpreted section 50-6-241. In cases cited by Anderson Hickey, the employees were fired or quit working after returning to work. In the case at hand, the plaintiff had not yet been treated. She was fired; then she underwent surgery and recuperated. At her release to full duty on June 8, 2000, the employer did not make her an offer of re-employment, simply because she had previously been fired for reasons unrelated to her injury.

The Panel noted that the court should not be required to conduct a "trial within a trial" to determine whether or not the firing was just. We, however, see no difference between determining the reasonableness of an offer, as required under the Newton test, and determining why an offer was not made. We agree with the defendant that an employer should be permitted

to enforce workplace rules without being penalized in a workers' compensation case. In our view, the General Assembly, by passage of section 50-6-241(a), did not intend to require an employer to make an offer of re-employment to an employee previously fired for violating workplace rules.

The plaintiff argues that allowing Anderson Hickey to benefit from the lower cap set forth in section 50-6-241(a)(1) will encourage employers to fire injured employees in order to take advantage of the lower cap. However, the law of retaliatory discharge protects employees from this behavior, as employers face law suits and the prospect of paying punitive damages to employees fired to avoid workers' compensation claims. See, e.g., Anderson v. Standard Register Co., 857 S.W.2d 555 (Tenn. 1993) (setting out the elements of a retaliatory discharge claim).

Therefore, we find that, under the unique circumstances of this case, the employer, Anderson Hickey, was not required to make a post-treatment offer of re-employment to the plaintiff, where she had been fired for misconduct prior to treatment, in order to gain the benefit of the lower cap set forth in section 50-6-241(a)(1). Thus, the two and one-half times multiplier applies.

### Plaintiff's Impairment Rating

Having determined that the two and one-half times cap applies, we must determine the plaintiff's impairment rating. The trial court relied on Dr. Boals' impairment rating to determine the plaintiff's disability because, the trial court explained, Dr. Boals' rating comported with the plaintiff's complaints. The defendant asserts that the trial court erred in relying on Dr. Boals' opinion over that of the treating physician, Dr. Jones.

As stated in the facts, after completing a month of physical therapy, the plaintiff was released by her treating physician, Dr. Jones, to full duty with no restrictions. The plaintiff, however, testified at trial that her shoulder injury still causes her pain and that it prevents her from performing everyday tasks like carrying grocery bags; furthermore, she testified that she has difficulty driving and that her son must help her fold the laundry. At the same time, however, the plaintiff testified that she has no intention of leaving her job as a forklift operator and that she could perform the requirements of a previous job she held, which consisted entirely of folding towels.

Dr. Boals' opinion was based on his review of Dr. Jones' medical records in addition to a one-time evaluation of the plaintiff on October 23, 2000. Dr. Boals suggested the following restrictions on Carter's activities: she should not reach far from her body, she should not perform repetitive lifting, and she should not perform any repetitive overhead lifting. As discussed in the facts, Dr. Boals also gave the plaintiff an impairment rating equating to 11% to the body as a whole, which was higher than the impairment rating assigned by Dr. Jones, which equated to 6% to the body as a whole.

-6-

The source of contention between Drs. Jones and Boals stems from disagreement over the procedure used to perform Carter's shoulder surgery and the effects of the procedure. Both doctors agree that Carter needed the surgery because spurs had formed on her distal clavicle and acromion, two bones involved in shoulder movement. When Carter moved her shoulder, the spurs rubbed against the joint, resulting in pain and loss of motion.

The doctors' descriptions of the arthroscopic Neer acromioplasty performed by Dr. Jones are different. Dr. Jones testified that the procedure performed on Carter involved the removal of the spurs, removal of the arthritic part of her clavicle, and shaving off the thickened part of the coracoacromial ligament (the "ligament"). It is the procedure on this ligament that is the chief area of debate between the doctors.

Dr. Boals asserts that the ligament was removed and that the deltoid muscle was weakened during the procedure, giving rise to additional impairment not accounted for by Dr. Jones. Dr. Jones denies removing the ligament. Furthermore, Dr. Jones testified that arthroscopic technology has improved the procedure since Dr. Boals was an active surgeon. Dr. Boals admits that he has not performed surgery of any type for five years, and that he prefers the "open" acromioplasty procedure, in which the shoulder is opened with an incision rather than accessed through a scope, over the arthroscopic procedure performed by Dr. Jones. Further, Dr. Boals stated that he only performed arthroscopic surgeries a few times when the technology was first available, between seven and ten years ago. Dr. Jones attributes Dr. Boals' different impairment rating to the fact that Dr. Boals based his opinion on the older, open procedure in which the deltoid muscle had to be split or peeled off the acromion bone and the ligament would be completely removed. Dr. Boals stated that "[the arthroscopic procedure] is a much better procedure than the open procedure . . .. It leaves no impairment."

From the depositions, it is clear to this Court that Dr. Boals based his additional impairment rating on the assumption that the plaintiff's surgery had weakened the deltoid muscle and removed a ligament. Dr. Jones, who performed the surgery, explained that neither is true in the case of an arthroscopic acromioplasty. Dr. Boals admitted that he had not performed surgery in five years and that he had very limited experience performing arthroscopic surgery.

Having reviewed the depositions, we now must consider which doctor to rely on. As this Court stated in Orman v. Williams-Sonoma, Inc., 803 S.W.2d 672, 677 (Tenn. 1991), "[i]t seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." We agree that this should be the case here. Having drawn our own conclusions about the weight and credibility of the expert medical testimony, we reverse the judgment of the trial court and give greater weight to the impairment rating expressed by Dr. Jones, who assessed the plaintiff a 10% impairment rating to the upper extremity, which equates to a 6% impairment to the body as a whole.

### Plaintiff's Permanent Partial Disability Award

This Court must now determine the plaintiff's vocational disability, considering factors such as the employee's age, education, skills, training, local job opportunities, and capacity to work at types of employment available. <u>See</u> Tenn. Code Ann. § 50-6-241(a)(1) and (b). Given the plaintiff's medical impairment rating of 6% to the body, the plaintiff's continued pain, and her employability, the Court sets the plaintiff's permanent partial disability at 15% to the body as a whole, the maximum award under the two and one-half times cap set forth in Tennessee Code Annotated section 50-6-241(a)(1).

## Conclusion

For the reasons stated herein, the judgment of the trial court is reversed. The plaintiff is awarded 15% permanent partial disability to the body as a whole, and this case is remanded to the trial court for any further proceedings. Costs of this appeal are taxed to the plaintiff, Joanne Carter.

_____
FRANK F. DROWOTA, III, CHIEF JUSTICE